10 CV 5210

R. Bruce Rich (RBR-0313)
Jonathan Bloom (JB-7966)
Heather R. Solow (HRS-8680)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
(212) 310-8000

*Attorneys for the Radio Music License Committee
and The Cromwell Group, Inc. and Affiliates, et al.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



U.S.D.C. S.D.N.Y.

---

IN RE APPLICATION OF THE CROMWELL
GROUP, INC. AND AFFILIATES, ET AL.

No. 10 CV ___ (DLC) (MHD)

Petition /

**APPLICATION OF THE
CROMWELL GROUP, INC.
AND AFFILIATES, ET AL.
FOR THE DETERMINATION
OF REASONABLE FINAL
LICENSE FEES**

---

Related to

UNITED STATES OF AMERICA,

        Plaintiff,

        v.

AMERICAN SOCIETY OF COMPOSERS,
AUTHORS AND PUBLISHERS,

        Defendant.

No. 41 CV 1395 (DLC) (MHD)

---

Related to

In the Matter of the Application for the
Determination of Interim License Fees for

THE CROMWELL GROUP, INC. AND
AFFILIATES, ET AL.

No. 10 CV 0167 (DLC) (MHD)

---

Applicant The Cromwell Group, Inc. and Affiliates, on its own behalf and on

behalf of thousands of commercial radio broadcast stations nationwide represented by the Radio

Music License Committee (RMLC) (collectively, "Applicants"), by its attorneys, Weil, Gotshal & Manges LLP, hereby applies, pursuant to Section IX(A) of the Second Amended Final Judgment, United States v. Am. Soc'y of Composers, Authors and Publishers, Civ. No. 41-1395 (S.D.N.Y. June 11, 2001) ("AFJ2"), for a determination of reasonable final license fees for such of Applicants' public performances of musical works in the ASCAP repertory as are encompassed by Applicants' license request letter dated December 11, 2009 (attached as Exhibit 1 hereto, without attachments). Specifically, Applicants, including approximately 6,200 commercial radio broadcast stations (the "Stations"), seek a determination of reasonable final license fees for the Stations' performances of music in the ASCAP repertory made by way of over-the-air broadcast transmissions, digital and high-definition (HD) transmissions, translators, and transmissions over Internet and wireless platforms or any other platform capable of displaying or disseminating a Station's transmissions. Applicants' request also includes, as applicable, the Station owners' radio division online or wireless transmissions of music in the ASCAP repertory.[1]  A current list of Stations is attached as Exhibit 2 hereto, which list will be updated from time to time.

Applicants seek reasonable blanket license fees (including an adjustable credit or "carve-out" from the blanket license fee for performances of compositions that are directly licensed to Stations by the copyright owners), and reasonable per-program license fees, for performances made in the United States for the period commencing January 1, 2010 through December 31, 2014.

---

[1] The sole limitation on Applicants' request pertains to such final licenses as may presently be in place between ASCAP and one or more Stations.

### The Parties

1.      The RMLC represents the collective interests of a majority of commercial radio
stations in the United States in connection with music licensing matters.  To that end, the RMLC
negotiates and/or manages litigation in proceedings such as this one over license fees for the
public performance of music by local commercial radio broadcasters throughout the country.
For more than fifty years, most U.S. commercial radio stations have either expressly authorized
the RMLC to negotiate and/or litigate with respect to ASCAP licenses on their behalf or have
agreed to be bound by the outcome of the ASCAP/RMLC negotiations or court proceedings.  As
a result, following the conclusion of negotiations and rate-setting proceedings between the
RMLC and ASCAP, thousands of radio stations have entered into license agreements with
ASCAP based on the outcome of those negotiations or proceedings.  The RMLC is dedicated to
obtaining licenses that reflect the realities of the current and changing state of the radio business.

2.      Upon information and belief, ASCAP is an unincorporated music performing
rights licensing organization representing the musical works of some 370,000 composer and
publisher members, with its headquarters located at One Lincoln Plaza, New York, NY 10023.

### Prior Dealings Between the Parties

3.      The radio industry's licensing relationship with ASCAP goes back decades.  The
industry's most recent agreement with ASCAP – which covered the years 2001-2009 and
expired on December 31, 2009 – provided for the payment of annual lump-sum fees for the first
time in the parties' licensing history.  At the insistence of the RMLC, the 2001-2009 agreement,
which was finalized in 2004, expressly provided that the amounts allocated to each year were not
meant to represent reasonable license fees for any particular year: "By agreeing to an Industry-
wide fee for the period 2001-2009, the parties have expressly not agreed that the Annual License

Payment set forth herein comprises reasonable license fees for a particular year but instead reflect arbitrary yearly allocations for the convenience of both the Licensees and ASCAP." <u>See</u> Exhibit 3 hereto, Ex. A ¶ 7. The parties further agreed that the amounts allocated to each year were intended to be non-precedential with respect to a final fee proceeding for any subsequent time period. <u>See</u> <u>id.</u>

4.      The parties' prior license agreement, which expired at the end of 2000, called for blanket license fees at the rate of 1.615% of adjusted station revenues.

5.      On December 11, 2009, before the expiration of the 2004 ASCAP agreement, Applicants sent a letter to ASCAP in accordance with Section IX(A) of AFJ2 (<u>see</u> Exhibit 1 hereto, without attachments), requesting blanket (including an adjustable credit or "carve-out" from the blanket license fee for performances of compositions that are directly licensed to Stations by the copyright owners) and per-program licenses, effective January 1, 2010.

6.      Despite Applicants' good-faith efforts to negotiate a reasonable final license fee with ASCAP, the parties have been unable to reach agreement, necessitating the filing of this Application.

### The Parties' Interim Fee Rate Proceeding

7.      Effective January 1, 2010, the Stations continued to pay license fees to ASCAP on an agreed-to provisional basis pending a negotiated interim fee resolution or a judicial determination of interim fees. Unable to reach agreement on interim fees, Applicants and ASCAP jointly applied to this Court on January 8, 2010 for the determination of reasonable interim license fees. <u>United States</u> v. <u>Am. Soc'y of Composers, Authors and Publishers</u> (<u>In the Matter of the Application for the Determination of Interim License Fees for The Cromwell Group, Inc. and Affiliates, et al.</u>), No. 10 CV 0167 (DLC) (MHD) (S.D.N.Y. filed, Jan. 8, 2010).

8.    On May 13, 2010, the Court set interim license fees at the rate of $192,413,111 per year. United States v. Am. Soc'y of Composers, Authors and Publishers (In the Matter of the Application for the Determination of Interim License Fees for The Cromwell Group, Inc. and Affiliates, et al.), Memorandum and Order, No. 10 CV 0167 (DLC) (MHD) (S.D.N.Y. May 13, 2010) at 4.  On May 25, 2010, the Court entered an Interim Fee Order detailing the terms and conditions governing the payment of such interim fees (attached as Exhibit 4 hereto).  Such interim fees will remain in effect until superseded either by negotiated agreement of the parties or by subsequent determination by this Court of reasonable final fees.  Such interim fees (as well as the provisional fees that will have been paid in the period between January 1, 2010 and May 12, 2010) are subject to retroactive adjustment to January 1, 2010, on the basis of such final terms and conditions.

9.    The interim fees have been set by this Court on a without-prejudice basis with respect to what may constitute a reasonable final license fee.

### Jurisdiction

10.    This Court has continuing jurisdiction over the setting of reasonable license fees for the public performance of works in the ASCAP repertory pursuant to AFJ2.  AFJ2, §§ IX, XIV.

11.    Pursuant to Section IX(A) of AFJ2, the Court has jurisdiction over the instant Application.  Accordingly, Applicants may seek this Court's determination of reasonable final license fees, retroactive to the date of Applicants' written request to ASCAP.

### The Fees Under the Prior License Are No Longer Reasonable Given the Changed Economic Circumstances of the Radio Industry

12.    In 2004, the radio industry agreed to pay ASCAP just over $1.7 billion (allocated in escalating annual sums) for blanket and per-program licenses covering the years 2001 through

2009. This agreement reflected a departure from prior radio industry licenses, which had been priced based on stipulated percentages of adjusted station revenues. The most recent such license, covering the 1996-2000 period, called for payments at the rate of 1.615% of adjusted station revenues.[2] The total fees for the period contemplated by the 2004 license with ASCAP were intended to roughly approximate those that the industry would have paid had the existing percentage-of-revenue rates been continued on the assumption that revenues would grow over the license term at roughly their historical rate, i.e., 6-7%. For 2001-2003, the fees agreed to retroactively were those already collected by ASCAP under the prior percentage-of-revenue license, as continued by the parties consensually on an interim basis.

13.    The anticipated revenue growth on which the 2004 ASCAP agreement was predicated failed to materialize. Instead, revenues leveled off beginning in 2004, started to decline in 2007, and then turned sharply downward in 2008 and 2009, ultimately plummeting by nearly 30% over the license term. This steep drop in revenue – unprecedented in the history of the radio industry and unanticipated by the parties or by industry analysts – produced a gap of approximately $300 million between what the industry would have paid under the prior percentage-of-revenue rate and what it actually paid under the 2004 license.

14.    In light of this precipitous unanticipated revenue decline, and the current stagnant condition of the commercial radio industry, a continuation of fixed fees at a level at or near that paid by the industry under the 2004 ASCAP agreement would be unreasonable. The sharp revenue drop the industry experienced beginning in 2007, coupled with the fixed fee payments to ASCAP, caused the effective percentage-of-revenue rate the industry paid to ASCAP to balloon

---

[2] The 1.615%-of-revenue rate applied to stations with a blanket license from ASCAP. ASCAP also offered stations a per-program alternative, priced beginning at 0.24% of adjusted station revenues, that was available as a practical matter only to non-music format stations.

by more than 20% over the license term and by nearly 90% as of 2009 as compared to the percentage-of-revenue rate the industry paid prior to 2004. This increase represented a dramatic divergence from the industry's expectation in 2004 that with expected revenue growth at or about the historical rate, the fixed fees under the industry's ASCAP license would produce annual payments approximating those that would have been owed had the prior percentage-of-revenue agreement been continued. As it turned out, as of 2009, the effective percentage of revenue the industry paid ASCAP had reached a level far above what the industry would have agreed to pay in 2004.

15.    The unprecedented recent economic downturn has necessitated drastic belt-tightening measures in the radio industry. Plummeting advertising revenues have forced radio stations across the country to implement deep cost cutting – including layoffs, salary reductions, programming changes, and cessation of marketing and advertising efforts – to stay afloat. Total employment in the radio industry declined by some 12% from 2007 to 2009.

16.    The cuts have affected even the largest radio groups, as major radio groups fell, or nearly fell, into bankruptcy. The third largest radio group in the country, Citadel, filed for bankruptcy on December 20, 2009 (following its delisting from the New York Stock Exchange), and Clear Channel, the largest radio group in the country, narrowly averted the same fate by selling $2.5 billion in bonds in December 2009.

17.    Under most current projections of radio industry growth, it will be many years, if ever, before revenues return to their 2006 level.

18.    Applicants have not increased their use of ASCAP music in any way that might justify a continuation of the fees paid under the parties' recently expired agreement. Nor can such continuation be justified by the expanded scope of this license as compared to the prior

license. Both revenues and the audience associated with the so called "new media" platforms, some of which were not covered by the scope of the prior license, are miniscule relative to terrestrial radio revenues and audience. The entirety of the radio industry's exploitations of the "new media" currently generate only about 3% of total radio industry revenue. The audience generated by the exploitations of "new media" is similarly small. Although industry analysts expect that these "new media" activities will grow, they are expected to amount to only 5% of total radio industry revenues by 2013.

19.    The unanticipated economic crisis experienced by the radio industry renders the fees imposed by the 2004 ASCAP license not only unreasonable in light of the parties' expectations, history, and traditional fee benchmarks, but unsustainable.

20.    Applicants therefore respectfully request that the Court set reasonable final fees that are substantially lower than those provided in the parties' 2004 license. More specifically, Applicants request that the Court set final blanket license fees at the percentage-of-revenue level historically paid by the radio industry to ASCAP prior to the 2004 license. In making their request for a determination of reasonable final fees, Applicants respectfully ask that the Court take into account the changed economic circumstances described above as well as other factors to be demonstrated at trial, including the lack of competition to ASCAP for its blanket license and the appropriateness of a "carve-out" fee mechanism that will provide credits to Applicants for performances of ASCAP-affiliated music that Applicants license directly from copyright owners.

**Relief Requested**

21.     Applicants respectfully request that the Court determine reasonable final blanket and per-program license fees for the performance of ASCAP music by way of Stations' over-the-air broadcast transmissions, digital and high-definition (HD) transmissions, translators, and transmissions over Internet and wireless platforms or any other platform capable of displaying or disseminating a Station's transmissions, as well as for the Station owners' radio division online or wireless transmissions of music in the ASCAP repertory, as applicable, for the period January 1, 2010 to December 31, 2014.

22.     Pursuant to Section IX(A) of AFJ2, and in accordance with Applicants' December 11, 2009 request to ASCAP for a license fee quotation, Applicants ask that any reasonable final fee set by the Court be made retroactive to January 1, 2010.

New York, New York
July 8, 2010

WEIL, GOTSHAL & MANGES LLP

By: *R. Bruce Rich*
     R. Bruce Rich (RBR-0313)
     Jonathan Bloom (JB-7966)
     Heather R. Solow (HRS-8680)

767 Fifth Avenue
New York, New York 10153
Phone: (212) 310-8000
Fax: (212) 310-8007
Email: bruce.rich@weil.com
          jonathan.bloom@weil.com
          heather.solow@weil.com

*Attorneys for the Radio Music License Committee*
*and The Cromwell Group, Inc. and Affiliates, et al.*